**BACKPAGE.COM, LLC, Plaintiff,**

and

**Internet Archive, Plaintiff–Intervenor,**

v.

**Rob McKENNA, Attorney General of the State of Washington, et al., Defendants, in their official capacities.**

**Case No. C12–954–RSM.**

United States District Court,
W.D. Washington,
at Seattle.

July 27, 2012.

Ambika K. Doran, James C. Grant, Davis Wright Tremaine, Seattle, WA, for Plaintiff.

Matthew J. Zimmerman, Electronic Frontier Foundation, San Francisco, CA, Venkat Balasubramani, Focal PLLC, Seattle, WA, for Plaintiff–Intervenor.

Lana Sue Weinmann, Amy Kathleen Eiden, David J. Eldred, Seattle, WA, Ione S. George, Jacquelyn Moore Aufderheide, Jeremy Aaron Morris, Kitsap County Prosecutor's Office, Port Orchard, WA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

RICARDO S. MARTINEZ, District Judge.

### I. INTRODUCTION

This matter comes before the Court on the Motion for a Preliminary Injunction filed by Plaintiff Backpage.com, LLC ("Backpage.com") (Dkt. # 2) and the Motion Joining in the Motion for a Preliminary Injunction filed by Plaintiff–Intervenor, the Internet Archive ("IA") (Dkt. # 34). Backpage.com and IA ("Plaintiffs") seek to preliminarily enjoin enforcement of a new Washington law, Senate Bill 6251 ("SB 6251"), which was scheduled to take effect on June 7, 2012. SB 6251 criminalizes the offense of advertising commercial sexual abuse of a minor. For the reasons set forth below, Plaintiffs' motions are GRANTED.

## II. DISCUSSION

### A. Background

#### 1. *Plaintiff Backpage.com*

Plaintiff Backpage.com operates an on-line classified advertising service located at www.backpage.com. It is the second largest online advertising service and hosts millions of advertisements per month throughout the country. Ads displayed on Backpage.com's website are categorized by state and city, then by topical category, such as local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, forums, dating, adult, and services. The advertisements themselves are created and posted by Backpage.com's users, who pay $5–$10 to post ads in the adult category, $1 to post ads in the dating category, or otherwise post ads for free. Backpage.com requires that users pay any advertising fees by credit card. *See generally* Dkt. # 3.

Pursuant to Backpage.com's Terms of Use, illegal content and illegal activity is prohibited on the Backpage.com service. *See* Dkt. # 3, Ex. B. Adult content and explicit material is only allowed to be posted in designated adult categories by an adult who is over 18 years of age. *Id.* "Obscene or lewd and lascivious graphics or photographs which depict genitalia, actual or simulated sexual acts or naked images" are prohibited. *Id.* at Ex. C ("Posting Rules"). Users are instructed that "[a]ny post exploiting a minor in any way will be subject to criminal prosecution and will ·be reported to the *Cybertipline* for law enforcement." *Id.*

If a user comes across an ad that does not comply with these rules, the user may report the ad to Backpage.com by clicking a Report Ad link in the ad. Doing so brings the user to a Report Ad page where he or she can select whether the ad is "Inappropriate or Illegal Content", "Over Posted / Spam", or "Wrong Category."

*Id.* at F. The webpage instructs users to email abuse@backpage.com if the ad "involves a threat to a child or an image of child exploitation." *Id.*

Users seeking to post or view material in the adult or dating categories are shown a page entitled "Disclaimer" prior to entering those portions of the site. *See Id.* at Ex. D. The disclaimer requires, *inter alia,* that the user represent that he or she is 18 years of age or older and that he or she will report any suspected exploitation of minors and/or human trafficking to the appropriate authorities. The user must click on words "I agree" prior to entering these portions of the Backpage.com website. *Id.* A hyperlink on the page links to a popup window entitled Stop Trafficking that lists phone numbers and tip lines that users can use to report exploitation of children and human trafficking. *Id.* at Ex. E.

Links to a page entitled User Safety "are available throughout" the Backpage.com website. *Id.* at ¶ 12 & Ex. H. The User Safety page includes information on Responding to an Ad, Placing an Ad, Safety Tips, Scams and Fraud, Human Trafficking, and Child Exploitation. The Human Trafficking and Child Exploitation portions of the User Safety page provide links and phone numbers for the National Human Trafficking Resource Center ("NHTRC") and the National Center for Missing and Exploited Children ("NCMEC"). *Id.* at Ex. H.

Backpage.com also monitors content submitted by users to the adult. and dating sections of its website. Most posts are filtered through an automated system that scans content for approximately 26,000 "red-flag" terms, phrases, codes, email addresses, URLs and IP addresses. Dkt. # 3 at ¶ 13. In addition, Backpage.com manually reviews "nearly all content" submitted for posting to the adult and dating

categories. *Id.* Most ads are reviewed for illegal and other prohibited conduct prior to posting, then reviewed a second time once they are posted online. *Id.* Over 100 people and more than 80% of Backpage.com's workforce are engaged in this monitoring process.

Backpage.com submits referrals for suspected juveniles posting on Backpage.com to NCMEC. When this happens, NCMEC prepares reports based on the referrals and forwards its reports to the FBI. *See* Dkt. # 64, ¶ 4. The FBI then distributes the reports to various local law enforcement agencies, including the High Risk Victims section of the Seattle Police Department's VICE unit. *Id.*

In April 2012, users posted more than 3.3 million ads on Backpage.com. *Id.* at ¶ 4. That same month, Backpage.com blocked, banned or removed more than 1 million user submissions and posts and referred approximately 400 posts to NCMEC. *Id.* at ¶ 14.

### 2. *Plaintiff in Intervention the Internet Archive*

The Internet Archive is a non-profit corporation whose mission is to build an "Internet library," offering permanent access to historical collections that exist in digital format for researchers, historians, and scholars. Dkt. # 36, ¶ 13. Founded in 1996, IA works to prevent the Internet and other "born-digital" materials from disappearing into the past. *Id.* at ¶ 16. As part of this mission, IA regularly gathers "snapshots" of content on the World Wide Web through a "crawling" and indexing process. *Id.* It currently maintains over 150 billion web pages archived from 1996 to the present from web sites around the world, including archives of third-party content posted to web sites like Backpage.com and craigslist.org. *Id.* IA claims that SB 6251 would severely impede the practice of hosting third-party content online. *Id.* at ¶ 3.

### 3. *Human Trafficking and Child Exploitation on the Internet*

Experts estimate that at least 100,000 American juveniles are victimized through prostitution every year. Dkt. # 43, ¶ 3. "A 2008 Seattle human services department report estimated that there are three hundred to five hundred children being exploited for sex in the Seattle area alone each year." SB 6251 § 1.

Many child prostitutes are advertised through online escort advertisements displayed on Backpage.com and similar websites. Dkt. # 45, ¶ 19. These advertisements are created by prostitutes or third parties at the direction of a pimp or by the pimp him- or herself. *Id.* Since 2010, the Seattle Police Department ("SPD") has recovered at least twenty-two children advertised online in the Seattle area for commercial sex. SB 6251 § 1.

Although Backpage.com screens adult ads prior to posting, ads depicting minors still appear online. For example, Defendants point to a recent investigation in which a Backpage.com user identified a photograph associated with an escort ad in the "Seattle escorts" section of the website as depicting a minor. *See* Dkt. # 46, ¶¶ 5–20. A few days later, on June 11, 2012, the juvenile depicted was arrested and booked into the King County juvenile detention center for prostitution. *Id.* at ¶ 9. Authorities identified the juvenile as "C.C." and confirmed that she was 15–years–old and that she had arranged to have sexual intercourse with a man for $80. *Id.*

The same day that C.C. was arrested, Seattle Police Department detective Todd Novisedlak located another advertisement for C.C. posted on Backpage.com. *Id.* at ¶ 11. Novisedlak contacted Backpage.com,

asking that the ad be removed as it depicted a confirmed minor. *Id.* at ¶ 12. Novisedlak also asked that all other advertisements posted by the same user also be removed. *Id.* Backpage.com subsequently removed the ad identified by the detective. *Id.* at ¶ 13.

On June 19, 2012, the FBI distributed another NCMEC report to the SPD regarding a Backpage.com ad depicting C.C. *Id.* at ¶ 14. This ad had been reported to NCMEC by a Backpage.com moderator who felt that the person depicted in the ad looked young. *Id.*

Over the course of the next week, Detective Novisedlak identified an additional six advertisements depicting C.C. *Id.* at ¶ 17. Each of the advertisements listed the same phone number and included the same pictures of C.C. *Id.* All but one of the ads listed prices as 15–20 Min-$60; 30 Min-$80; 1 Hr-$110. *Id.*

On June 24, 2012, an undercover police officer with the King County Sheriff's Office viewed an advertisement on Backpage.com that depicted C.C. *Id.* at ¶ 18. The officer called the number on the advertisement and arranged a meeting with a female. *Id.* at ¶ 19. The officer and the female agreed on a price of $80 for 30 minutes and an address at which to meet. *Id.* Upon arriving at the address, the officer discovered fifteen-year-old C.C. *Id.*

Detective Novisedlak states that in the course of conducting investigations into the commercial sexual abuse of minors, he has visited the escort sections of several websites, including Backpage.com, and viewed hundreds of advertisements for what appeared to be prostitution services. *Id.* at ¶ 3. He has never contacted any person, juvenile or otherwise, posting advertisements on the escorts section of Backpage.com who was advertising for legitimate escort services. *Id.*

### 4. *Senate Bill 6251*

SB 6251 makes it a felony to knowingly publish, disseminate, or display or to "directly or indirectly" cause content to be published, disseminated or displayed if it contains a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value." Under the proposed law, it is not a defense that the defendant did not know the age of the person depicted and the defendant may not rely on representation by or the apparent age of the person depicted. The only defense allowed under the law is that a defendant obtained and retained government or school identification for the person depicted.

The substantive provisions of the law are as follows:

(1) A person commits the offense of advertising commercial sexual abuse of a minor if he or she knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in the state of Washington and that includes the depiction of a minor.

(a) "Advertisement for a commercial sex act" means any advertisement or offer in electronic or print media, which includes either an explicit or implicit offer for a commercial sex act to occur in Washington.

(b) "Commercial sex act" means any act of sexual contact or sexual intercourse, both as defined in chapter 9A.44 RCW, for which something of value is given or received by any person.

(c) "Depiction" as used in this section means any photograph or visual or printed matter as defined in RCW 9.68A.011(2) and (3).

(2) In a prosecution under this statute, it is not a defense that the defendant did not know the age of the minor depicted in the advertisement. It is a defense, which the defendant must prove by a preponderance of the evidence, that the defendant made a reasonable bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. In order to invoke the defense, the defendant must produce for inspection by law enforcement a record of the identification used to verify the age of the person depicted in the advertisement.

### 5. *Procedural history*

SB 6251 was scheduled to go into effect on June 7, 2012. Plaintiff filed this action on June 4, 2012, pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, to enjoin enforcement of SB 6251, claiming that the new law violates the Communications Decency Act of 1996, 47 U.S.C. § 230, and the First, Fifth, and Fourteenth Amendments and Commerce Clause of the United States Constitution. *See* Dkt. # 1. That same day, Backpage.com filed a motion for a Temporary Restraining Order and Preliminary Injunction to preliminarily enjoin Defendants from enforcing the law, pending a final decision on the merits. *See* Dkt. # 2.

On June 5, 2012, the Court entered a temporary restraining order ("TRO") for a period of fourteen days, restraining Defendants from taking any actions to enforce SB 6251 or pursue prosecution under the law in any way. *See* Dkt. # 7. Plaintiff's motion for a preliminary injunction was set for hearing on Friday, June 15, 2012. On June 7, 2012, the parties stipulated to a continuance of the hearing on Plaintiff's motion for a preliminary injunction and to an extension of the TRO. *See* Dkt. # 17. Thereafter Plaintiff IA moved to intervene and IA's motion was granted. *See* Dkt. ## 22 & 33. IA filed a motion joining in Backpage.com's motion for a preliminary injunction (Dkt. # 34) and also filed a separate complaint (Dkt. # 36).

On July 10, 2012, Plaintiffs agreed to dismiss all claims against Stevens County Prosecuting Attorney Tim Rasmussen, who agreed not to enforce SB 6251 during the pendency of this lawsuit. On July 20, 2012, this Court heard oral argument from the parties and took the matter under advisement.

### B. Analysis

#### 1. *Preliminary Injunction Standard*

At this juncture, Plaintiffs seek a preliminary injunction of the statute pending a final determination on the merits. A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A plaintiff seeking a preliminary injunction must establish; (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.; see also Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1021 (9th Cir.2009). Here, Plaintiffs have established each of the four requisites.

#### 2. *Standing*

"When contesting the constitutionality of a criminal statute, it is not neces-

sary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (internal quotation marks and alterations omitted). In the First Amendment context, " 'it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff' " *Wong v. Bush,* 542 F.3d 732, 736 (9th Cir.2008) (quoting *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1154–55 (9th Cir. 2000)). A credible threat of prosecution exists when the challenged law "is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (allowing booksellers to bring pre-enforcement challenge to law that would make it unlawful to knowingly display obscene material).

■ Plaintiffs can show that there is a credible threat that SB 6251 will be enforced against them. Washington legislators have openly stated that the challenged statute is aimed at Backpage.com and that they seek to eliminate escort ads and similar Internet postings. *See, e.g.,* Dkt. # 4, Ex. 2, p. 4; *see also* Dkt. # 25, ¶ 22. ¶ Backpage.com and IA's interpretation of the statute is correct, "the threat of criminal prosecution under the law will require them to undertake the impossible task [of] review[ing] and censor[ing] third-party content, or obtain[ing] and retain[ing] the required forms of identification from all third-party users seeking to post such content, or block[ing] content altogether." Dkt. # 28, ¶ 26.[1]

■ Similarly, IA has "an actual and well-founded fear that the law will be enforced against [it]." *Am. Booksellers,* 484 U.S. at 393, 108 S.Ct. 636. Defendants argue that the statute will not apply to IA because, due to the nature of its service, it cannot "knowingly" publish, disseminate, or display illegal content. However, as discussed further below, whether the statute requires such knowledge is in dispute. The question is whether, if *IA's* interpretation of the statute is correct, it will be forced to "take significant and costly compliance measures or risk criminal prosecution." *Am. Booksellers Ass'n,* 484 U.S. at 392, 108 S.Ct. 636. Given the nature of IA's service, and the fact that it currently does not monitor the majority of the content that it provides through its Wayback Machine, a criminal statute that imposed strict liability on IA would be costly indeed.

■ Moreover, even if IA lacked standing to bring an "as-applied" challenge to the law, it certainly has standing to challenge the statute on its face. In the First Amendment context, " '[l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.' " *Secretary of State of Maryland v. J.H. Munson Co.,* 467 U.S. 947, 956–957, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), quoting *Broadrick*

---

1. A verified complaint, like an affidavit, may support injunctive relief. *Thalheimer v. City of San Diego,* 645 F.3d 1109, 1116 (9th Cir. 2011) (citing *Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir.1985); *Ross–Whitney Corp. v. Smith Kline & French Labs.,* 207 F.2d 190, 198 (9th Cir.1953)).

*v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). As in *American Booksellers*, "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." 484 U.S. at 393, 108 S.Ct. 636. Third party standing is appropriate in this case.

### 3. *Likelihood of Success on the Merits*

■ Plaintiffs bring this lawsuit under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs claim that Defendants, who are prosecuting attorneys of each of the counties of the state of Washington, will deprive them and others of their First, Fifth and Fourteenth Amendment rights under the constitution, and will violate the dormant Commerce Clause of the U.S. Constitution and the Communications Decency Act of 1996, 47 U.S.C. § 230, if permitted to enforce SB 6251. Plaintiffs are likely to succeed on the merits of their claims.

#### a. *Communications Decency Act*

Plaintiffs argue that SB 6251 conflicts with and is therefore preempted by the Communications Decency Act of 1996. Three subsections of the CDA are relevant. First, subsection (c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Second, subsection (c)(2)(A) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of—any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." . Third, subsection (e)(3) provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

In enacting the CDA, "Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others." *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir.2003) (internal citation omitted). Congress made this choice for two reasons. First, "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Id.* at 1027. Second, Congress wanted to "encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material." *Id.* at 1028.

Indeed, Section 230 was a reaction to a New York state court decision in which Prodigy, an Internet access provider that ran online bulletin boards, was held liable for the libelous statements of others. *See Stratton Oakmont v. Prodigy Services Co.*, 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995). Prodigy was liable largely because of its active role in monitoring its bulletin boards and "Congress was concerned with the impact such a holding would have on the control of material inappropriate for minors." *Batzel*, 333 F.3d at 1029. "If efforts to review and omit third-party . . . inappropriate material make a computer service provider or user liable for posted speech, then website operators and Internet service providers [would be] likely to abandon efforts to eliminate such material from their site." *Id.* (citing, *inter alia*, S.Rep. No. 104–230, at 194 (1996); H.R.

Cong. Rep. No. 104–458, at 194 (1996), 1996 U.S.C.C.A.N. 10; 141 Cong. Rec. at H84691–70 (1996)).

■ Thus, under Section 230 "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1170–71 (9th Cir.2008). "The message to website operators is clear: if you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune." *Id.* at 1175. Further, the Ninth Circuit acknowledges that "there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality." *Id.* at 1174. "Such close cases . . . must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Id.*

Plaintiffs argue that under this clear precedent, SB 6251 violates Section 230 because it treats online service providers like Backpage.com and IA "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Defendants argue that SB 6251 is not preempted as it is consistent with the CDA; because, under *Salerno,* there are applications of the law that do not conflict with the CDA; and because the CDA does not apply to state criminal laws.

\* \* \*

■ The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI,

cl. 2. Under this principle, Congress has the power to preempt state law. *See Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). However, in considering whether a state statute is preempted, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); citing *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)).

■ There are three circumstances in which Congress has the power to preempt state law. First, Congress may expressly preempt inconsistent state laws. *Arizona v. U.S.,* 132 S.Ct. at 2500–01 ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision."). Second, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* (citing *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 115, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). Third, under the doctrine of conflict preemption, state laws are preempted when they conflict with federal law. *Crosby,* 530 U.S. at 372, 120 S.Ct. 2288. "This includes cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. U.S.,* 132 S.Ct. at 2501 (internal quotations and citations omitted).

Here, Plaintiffs are likely to succeed on their claim that SB 6251 is preempted both because it is likely expressly preempted and because it likely conflicts with federal law. Subsection (e)(3) of Section 230 provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Therefore, Congress has expressly preempted state laws that are "inconsistent with" Section 230.

SB 6251 is likely inconsistent with and therefore expressly preempted by Section 230 for two reasons. First, Section 230 prohibits "treat[ing]" "online service providers" as the "publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. The parties do not dispute that Backpage.com and IA are "online service providers." "And SB 6251 "treat[s]" both entities as the publisher or speaker of information created by third parties." It does this by imposing liability on Backpage.com and IA for information created by third parties—namely ads for commercial sex acts depicting minors—so long as it "knows" that it is publishing, disseminating, displaying, or causing to be published, disseminated, or displayed such information. *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir.2010) ("The majority of federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause of action that would *make service providers liable* for information originating with a third-party user of the service.") (internal citations omitted) (emphasis added); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir.2009) ("[W]hat matters is not the name of the cause of action ... [but] whether [it] inherently requires the court

to treat the defendant as the 'publisher or speaker' of content provided by another.").

Second, SB 6251 is inconsistent with Section 230 because it criminalizes the "knowing" publication, dissemination, or display of specified content. In doing so, it creates an incentive for online service providers *not* to monitor the content that passes through its channels. This was precisely the situation that the CDA was enacted to remedy. *See Batzel*, 333 F.3d at 1029.

Finally, and for the same reason, even if the wording of Section 230 prohibiting liability under state laws "inconsistent" with the federal statute did not expressly preempt SB 6251, the state statute likely conflicts with the CDA because "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. U.S.*, 132 S.Ct. at 2501. "Like the strict liability imposed by the *Stratton Oakmont* court, liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation." *Zeran*, 129 F.3d at 333.

Defendants argue that SB 6251 is consistent with Section 230 because it is consistent with Congress's purpose of "ensur[ing] vigorous enforcement of Federal criminal laws" and because it is similar to federal statutes that Congress singled out as exempt from Section 230's liability protection. For example, Defendants point to 18 U.S.C. § 1591, which pertains to sex trafficking of children. Under Section 1591, anyone who knowingly benefits financially from causing a person under the age of 18 to engage in a commercial sex act with knowledge or reckless disregard of that fact is guilty of a criminal offense. While both Section 1591 and SB 6251 pertain to sex trafficking of children, there are myriad differences between the state and federal statutes. Most importantly,

Section 1591 pertains to conduct, whereas SB 6251 pertains to speech. As a result, 1591's effect on the operation of the Internet is incidental; SB 6251 is directly aimed at online service providers. Thus, even if SB 6251 seeks to achieve one of the same goals as the federal law—policing the sex trafficking of minors— "it involves a conflict in the method of enforcement." *Arizona*, 132 S.Ct. at 2505. "The Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'" *Id.* (citing *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)).

Nor are Defendants' other arguments likely to save SB 6251 from preemption. In determining whether a state statute is preempted by federal law, the Ninth Circuit has applied the facial challenge standard from *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Under *Salerno*, "the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745, 107 S.Ct. 2095. Defendants argue that because SB 6251 may be applied in an off-line environment, the statute is not preempted under *Salerno*.

The Supreme Court has called into question whether *Salerno* remains the standard for facial challenges to state statutes on preemption grounds. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself"). Even assuming that *Salerno* remains the standard, Defendants' ability to point to a non-preempted application of the law is not dispositive. The Ninth Circuit clarified how *Salerno* is to be applied in *United States v. Arizona:*

[T]he question before us is not, as Arizona has portrayed, whether state and local law enforcement officials can *apply* the statute in a constitutional way. Arizona's framing of the *Salerno* issue assumes that S.B. 1070 is not preempted on its face, and then points out allegedly permissible applications of it. This formulation misses the point: there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause.

*United States v. Arizona*, 641 F.3d 339, 346 (9th Cir.2011) *cert. granted,* —— U.S. ——, 132 S.Ct. 845, 181 L.Ed.2d 547 (U.S. 2011) and *aff'd in part, rev'd in part and remanded,* —— U.S. ——, 132 S.Ct. 2492, 183 L.Ed.2d 351 (U.S.2012) (emphasis in original).

Here, as in *Arizona*, the state statute conflicts with Congressional intent because, by imposing liability on online service providers who do not pre-screen content or who "know" that third party content may violate state law, the statute drastically shifts the unique balance that Congress created with respect to the liability of online service providers that host third party content.

Finally, Defendants argue that the CDA was intended only to apply to civil actions brought under state law and was not intended to apply where state criminal law provided the cause of action. Statutory interpretation begins with the statutory text, *BedRoc Ltd., LLC, Western Elite, Inc. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004), and statutes should be interpreted to give effect, if possible, to every clause and word, *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). When "Congress includes particular language in one section of a statute but omits it in another section of the same Act . . . it is

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Clay v. United States,* 537 U.S. 522, 528–29, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (internal quotations omitted).

The section of the CDA entitled "No effect on criminal law" provides that "[n]othing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (regarding obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other *Federal* criminal statute." 47 U.S.C. § 230(e)(1) (emphasis added). In contrast, the section entitled "No effect on communications privacy law" provides "[n]othing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, *or any similar State law." Id.* at § 230(e)(4). If Congress did not want the CDA to apply in state criminal actions, it would have said so. *See Voicenet Commc'ns, Inc. v. Corbett,* 2006 WL 2506318, at *4 (E.D.Pa. Aug. 30, 2006) ("[T]he plain language of the CDA provides internet service providers immunity from inconsistent state criminal laws.").

The Court finds that Plaintiffs are likely to succeed on their claim that Section 230 preempts SB 6251.

### b. First Amendment

Even if Plaintiffs did not succeed on their claim that SB 6251 is preempted by the CDA, they likely can succeed on their claim that the statute runs afoul of the First Amendment. The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law … abridging freedom of speech." The prohibitions of the First Amendment extend to the several States through the Fourteenth Amendment. Thus, "[s]tatutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment." *United States v. Alvarez,* ―― U.S. ――, 132 S.Ct. 2537, 2543, 183 L.Ed.2d 574 (2012).

██ Plaintiffs argue that the statute violates the First and Fourteenth Amendments on three grounds. First, Plaintiffs argue that the statute is unconstitutional because it creates strict liability for publishing unprotected speech and in doing so chills protected speech. Second, Plaintiffs argue that the statute is unconstitutionally vague because it does not provide defendants fair notice of what constitutes illegal speech and allows for arbitrary enforcement. Third, Plaintiffs contend that the statute is overbroad in that it effectively restricts the publication, display, and dissemination of both protected and unprotected speech. Where a statute restricts protected speech, it is subject to strict scrutiny. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Plaintiffs argue that the statute cannot withstand strict scrutiny because, while the government has a compelling interest in combating child prostitution, Defendants have not shown that the challenged statute is the least restrictive means available to do so. As set forth more fully below, Plaintiffs are likely to succeed on the merits of their First Amendment claims.

### (i) Strict Liability

██ The Constitution prohibits the "imposition of criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech." *United States v. United States District Court,* 858 F.2d 534, 540 (9th Cir.1988). Plaintiffs contend that SB 6251 is an unconstitutional strict liability crime that chills protected speech because (a) the word "knowingly" only applies to the first

clause of the statute; and (b) there is no *scienter* requirement regarding the age of the person depicted in the ad. Defendants dispute Plaintiffs' interpretation of the statute, arguing that strict liability only exists as to the age element of the crime. Therefore, before the Court reaches the constitutional issue, it must determine what the statute says.

\* \* \*

 When interpreting a state statute as a matter of first impression, a federal court must interpret the law as would the state's highest court. *See In re Kolb,* 326 F.3d 1030, 1037 (9th Cir.2003). In Washington, the Court begins with the plain language of the statute, assuming that the legislature "meant exactly what it said." *Duke v. Boyd,* 133 Wash.2d 80, 942 P.2d 351, 354 (1997). However, if the statute is ambiguous, the Court may consider legislative history and the "circumstances surrounding the enactment of the statute." *Five Corners Family Farmers v. State,* 173 Wash.2d 296, 268 P.3d 892, 900 (2011). A statute is ambiguous if it is susceptible to two or more reasonable interpretations. *Id.* Finally, "[w]here possible, statutes should be construed so as to avoid unconstitutionality." *Wash. State Republican Party v. Wash. State Public Disclosure Comm'n,* 141 Wash.2d 245, 4 P.3d 808, 827 (2000).

SB 6251 is comprised of two clauses. The Court will refer to the first clause ("publishes, disseminates, or displays") as the "publishing clause" and the second clause ("causes directly or indirectly, to be published disseminated, or displayed") as the "causing clause". Plaintiffs assume that the word "knowingly" applies only to the publishing clause and that the causing clause is devoid of any *scienter* requirement. Defendants argue that the statute was intended to require proof of *scienter* as to all elements except the age of the minor depicted.

Plaintiffs' reading of the statute is the most grammatical reading. The word "knowingly" precedes the publishing clause, but not the causing clause. The publishing clause is separated from the causing clause by interruptive punctuation and the word "or." The operative verb in the causing clause ("cause") is already modified by two other adverbs ("directly or indirectly"). The construction proposed by Defendants in which a third adverb modifies "cause" is awkward, if not ungrammatical. Namely, under Defendants' reading, a person commits a felony by "knowingly ... causing ... indirectly to be ... displayed" illegal content.

Defendants' interpretation of the statute, while awkward, is nonetheless reasonable. The publishing and causing clauses are not set forth in separate sections or subsections of the statute and the punctuation that separates the clauses is one of the least interruptive available: the comma. Since the parties have each offered reasonable interpretations of the statute, the Court must ascertain the legislature's intent by reference to legislative history. *Five Corners,* 268 P.3d at 900.

 Generally speaking, "some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime." *Staples v. United States,* 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *see also State v. Williams,* 158 Wash.2d 904, 148 P.3d 993, 996 (2006) (*en banc*) (discussing *Staples*). In the Senate Hearing on SB 6251, Senator Jeanne Kohl–Welles indicated that the primary impetus in passing SB 6251 was to require online service providers like Backpage.com to request and obtain identification before posting ads that appeared to be online advertisements for prostitution. *See* Dkt. # 4, Ex. 2, p. 4 ("The Seattle Weekly ... in its print ... publications, does require age verification

in person ... And what we would like to have happen is to have that same requirement for online advertisement postings."). In contrast, there is no indication in the legislative history that the Washington legislature intended to punish companies or individuals, like IA, who did not "know" that they were causing to be published, displayed, or disseminated content deemed illegal under the statute.[2] Therefore, the Court will interpret the statute as requiring *scienter* as to *both* the publishing and causing clauses.

\* \* \*

Plaintiffs argue that, even adopting Defendants' construction, by dispensing with a *scienter* requirement as to the age of the person depicted in the ad, SB 6251 runs afoul of the First Amendment. *See United States v. X–Citement Video, Inc.,* 982 F.2d 1285, 1291–92 (9th Cir.1992) (interpreting a law prohibiting the interstate transfer of child pornography as containing a *scienter* requirement because "a statute completely bereft of a *scienter* requirement as to the age of the performers would raise serious constitutional doubts"). This is likely true.

By its terms, SB 6251 dispenses with any *scienter* requirement as to the age of the minor "depicted" in the advertisement:

> *[I]t is not a defense that the defendant did not know the age of the minor depicted in the advertisement.* It is a defense, which the defendant must prove by a preponderance of the evidence, that the defendant made a reasonable bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination of display of the advertisement, production of a driver's license, marriage license, birth certificate, or *other governmental or educational identification card or paper of the minor*

depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. In order to invoke the defense, the defendant must produce for inspection by law enforcement a record of the identification used to verify the age of the person depicted in the advertisement.

SB 6251 (emphasis added).

At first blush, requiring publishers to check identification before publishing an escort ad seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door. There is, however, a key difference between these two scenarios. The latter is an identification requirement related to conduct—drinking alcohol in a bar. The former is an identification requirement—imposed by the government and punishable by imprisonment—related to speech. Since there is no constitutional right to drink alcohol, courts tasked with upholding the Constitution care little if a bar's identification verification process results in a line forming outside the door, or causes some restaurants to stop serving liquor. However, because there is a constitutional right to free speech, the Constitution cannot permit similar collateral consequences in the First Amendment context. *See United States of America v. United States District Court for the Central District of California,* 858 F.2d 534, 539 (9th Cir. 1988) ("[A] speaker may not be put at complete peril in distinguishing between protected and unprotected speech. Otherwise, he could only be certain of avoiding liability by holding his tongue, causing him 'to make only statements which 'steer far wide [ ] of the unlawful zone.' ' ").

---

2. As explained further below, the term "know" in the context of this statute likely renders the statute unconstitutionally vague.

However, for the purposes of this section, the Court assumes that the term "know" has a discernible meaning.

In *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1960), the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books. Even though the First Amendment does not protect obscene speech, the Court concluded that a bookseller could not be held criminally liable without proof of knowledge regarding the contents of the book:

> By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. For if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature.

*Smith,* 361 U.S. at 153, 80 S.Ct. 215.

Plaintiffs contend that here, as in *Smith,* SB 6251 would compel those publishers and distributors who did not abstain from publishing large categories of speech altogether to review every book, magazine, video, or online post containing a "depiction" and a possible "implicit" ad for sex to ensure that none ran afoul of the law. *See Smith,* 361 U.S. at 153–54, 80 S.Ct. 215. The Court finds that this is likely true. A pre-screening mechanism as set forth in SB 6251 would limit the amount of content available on some publishers' websites to the amount of content that such publishers had the time and money to screen. *See id.* Some individuals would be reticent to provide government identification in connection with borderline content, such as racy personal ads, thus further diminishing the universe of protected speech available online. *See also Doe v. 2TheMart.com Inc.,* 140 F.Supp.2d 1088, 1092, 1097 (W.D.Wash.2001) ("[T]he consti-

tutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded."). The Constitution does not permit such collateral burdens on protected speech.

Nor is this effect dissipated in a regime in which criminal liability is triggered only by notification or knowledge that "illegal" content is available on an actor's website. "Liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation." *See Zeran v. Am. Online, Inc.,* 129 F.3d 327, 333 (4th Cir.1997). This is because a publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illegal. Rather, the rational choice in such a scenario is to remove the content as quickly as possible, whether or not it constitutes protected speech.

Finally, an affirmative defense to escape liability, as exists here, does not render the statute constitutional. "[T]he possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized." *Speiser v. Randall,* 357 U.S. 513, 526–527, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Plaintiffs are likely to succeed on the merits of their claim that the strict liability component of SB 6251 violates the First Amendment.

*(ii) Vagueness*

Plaintiffs also challenge SB 6251 as unconstitutionally vague, in violation of the First, Fifth and Fourteenth Amendments. "[S]tandards of permissible statutory vagueness are strict in the area of free expression .... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Thus, laws regulating speech are void for vagueness when they are so ambiguous that a

reasonable person cannot tell what expression is forbidden and what is allowed. *See, e.g., Smith v. Goguen,* 415 U.S. 566, 569, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (invalidating state law that prohibited treating a flag "contemptuously"); *Baggett v. Bullitt,* 377 U.S. 360, 362, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (loyalty oath preventing "subversive person" from being employed in state was void for vagueness); *Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (striking down city ordinance that made it unlawful to interrupt police officers in the performance of their duties because the law "effectively grants the police the discretion to make arrests selectively on the basis of the content of the speech"). Here, the vagueness of SB 6251 is "a matter of special concern" because it is both a content-based regulation of speech and a criminal statute. *See Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 871, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). In this scenario, "[i]n addition to the opprobrium and stigma of a criminal conviction ... [t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872, 117 S.Ct. 2329.

Plaintiffs argue that the statute fails to define important terms and thus prevents citizens from knowing what is prohibited. Among the terms that the Washington legislature has neglected to define are "know," "indirect," "direct," "implicit" and "offer." The Court finds that Plaintiffs are likely to succeed in showing that such terms render the statute unconstitutionally vague.

Much of this vagueness derives from the third party liability aspect of SB 6251. The pimp that publishes the advertisement certainly "knows" whether his offer is for sex, whether explicitly or implicitly. However, what does it mean for the website operator to "know" that an advertisement "implicitly" offers sex? In Washington, "a person acts knowingly or with knowledge when ... he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." Wash. Rev.Code Ann. § 9A.08.010(b)(ii). However, where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that. Similarly, Defendants contend that "offer" is used "to make clear that a transaction does not have to be consummated for SB 6251 to apply." However, if the offer is implicit, how can a third party ascertain that which is being offered before the transaction is consummated?

Further, what does it mean to "knowingly ... cause ... indirectly" the publication of such an implicit offer? If a website operator like Backpage.com publishes an advertisement that uses a "common code to thinly veil the offer of the sex act," *see* Dkt. # 41, p. 31, and IA subsequently crawls that advertisement and publishes it through its Wayback Machine, knowing that Backpage.com has an "adult services" ad section and does not verify identification, is IA liable if it itself cannot produce photo identification?

Defendants offer several explanations for the disputed terms. For example, Defendants offer that " 'something of value' is used in the statute to indicate that it regulates not just offers of sex for money, but also those offers to exchange sex for other valuable things, such as drugs." Dkt. # 41, p. 32. " 'Implicit' is used to bring offers of sex within the statute's purview in cases where the advertisement does not explicitly indicate that a sex act will be provided in exchange for value." *Id.* at p. 31. " 'Directly or indirectly' is used in the statute to reach pimps." *Id.* at 32.

One of the purposes behind the vagueness doctrine is to prevent arbitrary enforcement occasioned by unclear standards. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."). While the statute might find itself on better constitutional footing if the statute included the definitions proffered by Defendants, it does not. Further, nothing binds Defendants, or their successors, to their current interpretations. *See Free Speech Coal., Inc. v. Attorney Gen. of U.S.,* 677 F.3d 519, 539 n. 15 (3d Cir.2012) ("[A] promise by the government that it will interpret statutory language in a narrow constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute."). Plaintiffs are likely to succeed on their claim that the statute is unconstitutionally vague.

*(iii) Overbreadth*

In addition to the strict liability and vagueness challenges above, Plaintiffs contend that SB 6251 is overbroad and will have a chilling effect on the protected speech of publishers and third-party content providers. *See Reno v. ACLU,* 521 U.S. at 872, 117 S.Ct. 2329. ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."). A statute regulating speech is overbroad if it "reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The doctrine seeks to strike a balance between competing social costs. *United States v. Williams,* 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). "On the one hand, the threat of enforcement of any overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects." *Id.*

 Defendants contend that the statute is not overbroad because it only regulates unprotected speech. Defendants posit that the statute reaches only offers to engage in illegal conduct or, in the alternative, that it regulates only commercial speech. It is true that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams,* 553 U.S. at 297, 128 S.Ct. 1830 (citations omitted). It is also true that commercial speech, while protected under the First Amendment, is afforded less protection that other forms of constitutionally protected expression. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). SB 6251, however, encompasses more than offers to engage in illegal transactions. And it pertains to both commercial and non-commercial speech.

The statute criminalizes more than offers to engage in illegal transactions because the statute encompasses transactions that are not illegal. Washington statutes criminalizing commercial sexual abuse of a minor require that the defendant pay or agree to pay a "fee" "as compensation" for a minor engaging or promising to engage in sexual content. *See* Wash. Rev.Code Ann. § 9.68A.100.[3]

---

3. Under Washington criminal law, a person is

guilty of commercial sexual abuse of a minor

The adult prostitution statute requires that a person engage or agree to engage in sexual conduct with another person "in return for a fee". *Id.* at § 9A.88.030.[4] In contrast, SB 6251 proscribes any "offer" for "any act of sexual contact or sexual intercourse ... for which something of value is given or received by any person," so long as that offer includes a depiction of a minor. Assuming that the undefined term "something of value" means anything that can be traded on a free market—including a bottle of wine, a nice dinner, or a promise to do the dishes—SB 6251's definition of "commercial sex act" encompasses vast swaths of legal, consensual, non-commercial sexual activity.[5] Moreover, there is no requirement that the minor depicted with the offer have any relation to the offer itself. Thus, a twenty-five-year old's profile on a dating website might fall under the statute if (a) one of the photographs associated with her profile was a picture of herself in high school and (b) she mentioned that she is "good in bed" and looking for a man to "cook her dinner every night". For that matter, a teenager's Facebook profile, aimed at her teenage friends but of course available to the world, teeming with the kinds of scandalous, provocative photographs and musings that are typical for some in this age group, could also fall under the language of SB 6251.

In addition, SB 6251 does not fall within the exception for offers to engage in illegal activity because SB 6251 prohibits not only "offers" to engage in commercial sex acts, but also the direct and indirect publication, dissemination, and display of such offers. The third-party publication of offers to engage in illegal transactions does not fall within "well-defined and narrowly limited classes of speech" that fall outside of First Amendment protection. *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). *See also Brown v. Entertainment Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) ("[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated.").

Nor is SB 6251 limited to commercial speech, which is entitled to less protection under the Constitution. *Central Hudson* defines "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561, 100 S.Ct. 2343. As just articulated, SB 6251 prohibits "offers" for sex acts that may only relate tangentially to the economic interests of the speaker and audience. Unlike the federal child pornography statute at issue in *United States v. Williams,* 553 U.S. 285, 128 S.Ct. 1830, 1836, 170 L.Ed.2d 650 (2008) (extending

---

if "he or she pays a *fee* to a minor or a third person *as compensation* for a minor having engaged in sexual conduct with him or her" or "agrees to pay a *fee* to a minor or a third person pursuant to an understanding that *in return therefore* such minor will engage in sexual conduct with him or her." Wash. Rev. Code Ann. § 9.68A.100 (emphasis added).

4. The statute criminalizing adult prostitution provides that a person is guilty of a misdemeanor if he or she "engages or agrees or offers to engage in sexual conduct with another person *in return for a fee.*" Wash. Rev. Code Ann. § 9A.88.030 (emphasis added).

5. Defendants argue that the term "commercial sex act" tracks language from a federal statute criminalizing sex trafficking. *See* 18 U.S.C. § 1591(e)(3). While this is true, the federal statute requires that the defendant recruit, entice, harbor, transport, provide, obtain, or maintain a minor and that he or she know or recklessly disregard the fact that the minor will be caused to engage in a commercial sex act. *Id.* at § 1591(a). Defendants point to no federal statute providing that a "commercial sex act," as defined by SB 6251, in and of itself constitutes illegal conduct.

criminal liability to one who "knowingly" "advertises, promotes, presents, distributes, or solicits" what is believed to be child pornography), SB 6251 reaches *beyond* direct proposals for commercial transactions to criminalize the indirect dissemination of such content.[6]

The most problematic aspect of SB 6251 is not the protected speech that it regulates by its terms, but the likelihood that it will chill a substantial amount of protected speech in addition to the unprotected speech that Defendants argue the statute was meant to address. Defendants contend that "[o]nline escort advertisements are thinly veiled offers of prostitution" and that if a website "contains a section for postings for escort services," it can eliminate its potential for liability under SB 6251 by either "ceasing the posting of advertisements for commercial sex acts altogether" or "conduct[ing] age verification as provided in the affirmative defense." Dkt. # 41, pp. 3 & 26. The Court does not dispute that, in passing SB 6251, the Washington legislature's intent was to provide this Hobson's Choice to website operators like Backpage.com. Unfortunately, not only is this formulation of the statute likely unconstitutional itself, but it fails to address the much more far-reaching effects of the statute.

Defendants present two pieces of evidence for the proposition that all online advertisements for escort services are actually offers for prostitution. The first is a declaration stating that when taken to task over the issue, an attorney and board member of Village Voice Media, Backpage.com's parent company, made the ambiguous statement, "Don't deny the undeniable," and laughed. Dkt. # 44, ¶ 3. The second is a declaration from detective

Todd Novisedlak stating that he has never contacted any person posting advertisements on the escorts section of Backpage.com who was advertising for legitimate escort services. Dkt. # 64, ¶ 4. In contrast, numerous states license, tax and otherwise regulate escort services as legitimate businesses. *See* Dkt. # 61, p. 22 (listing statutes); *see also Dart v. Craigslist, Inc.,* 665 F.Supp.2d 961, 968 (N.D.Ill. 2009) ("Plaintiff is simply wrong when he insists that [the adult services category and related subcategories] are all synonyms for illegal sexual services."). The Court finds it unlikely that Defendants would be able to prove that *all* online advertisements for escort services are ads for prostitution. Thus, a website that contains a section for postings for escort services that chooses to either shut down that section or require age verification will likely chill protected speech in the course of doing so.

Much more importantly, SB 6251 reaches beyond websites that contain sections for postings for escort services. The statute does not in any way limit liability to websites that contain such sections. Rather, SB 6251 extends to any direct or indirect publication, dissemination of display of proscribed content. At oral argument, Defendants asserted that the regulation would not affect websites like Facebook and Twitter because such websites do not have specific sections for escort services and thus, to the extent that the websites publish proscribed content, the websites do not "know" that their platforms are being used in this manner. However, Plaintiffs have provided evidence that, since craigslist.org removed its "adult" category, escort advertisements have already begun to

---

**6.** For example, IA could indirectly, knowingly cause to be disseminated content deemed illegal under SB 6251 in violation of the statute. However, because it is a not-for-profit entity that crawls the Internet for archival purposes, its doing so would be unrelated to its economic interests or those of the academics and historians that use its services.

appear on Facebook and other platforms. *See, e.g.,* Dkt. # 4, Ex. 2 (citing a study by a Columbia University professor showing that 83 % of prostitutes have a Facebook page and that, by the end of 2011, Facebook would be their number one medium of recruitment). Whether or not Facebook already "knows" that it is publishing such ads, if SB 6251 is enforced, Facebook will have a strong incentive to either ex-ante monitor content that is posted to its website or require blanket age verification before photos are uploaded to its site. This kind of restriction could cause dangerous chilling effects across the Internet.

\* \* \*

■■■■■ "Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. Am. Civil Liberties Union,* 542 U.S. 656, 660, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). "To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid and that the Government bear the burden of showing their constitutionality." *Id.* (internal citations omitted). A content-based limitation on speech will be upheld only where the state demonstrates that the limitation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■■■■ SB 6251 is a content based restriction on speech. A law is content-based if, to enforce it, "an official must necessarily examine the content of the message that is conveyed." *Am. Civil Liberties Union of Nev. v. City of Las Vegas,* 466 F.3d 784, 794 (9th Cir.2006). To prosecute an individual for violating SB 6251, an official must determine whether a particular advertisement contains each of the elements of the statute.

■■■ Since Plaintiffs have met their burden of showing that SB 6251 is a content-based restriction that implicates First Amendment rights, it is Defendants' burden to demonstrate that the statute is constitutional. *Perry,* 460 U.S. at 45, 103 S.Ct. 948; *see also Thalheimer v. City of San Diego,* 645 F.3d 1109, 1115–16 (9th Cir.2011) (holding that once the moving party makes a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, "the burden shifts to the government to justify the restriction"). To do so, Defendants must show that SB 6251 is narrowly tailored to further a compelling government interest. *Ashcroft v. ACLU,* 542 U.S. at 666, 124 S.Ct. 2783. "In considering this question a court assumes that certain protected speech may be regulated, and then asks what is the least restrictive alternative that can be used to achieve that goal." *Id.* (citing *Reno,* 521 U.S. at 874, 117 S.Ct. 2329).

Defendants certainly have a compelling interest in curbing the exploitation of minors through prostitution. The Supreme Court has recognized "that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). Indeed, "the protection of our young from sexual abuse may be among the most important functions of a civilized society." *U.S. v. U.S. District Court for the Central District of California,* 858 F.2d at 541 (citations omitted). Jim Pugil, Chief of the Seattle Police Department testified in hearings that "the online advertising of youth for sexual exploitation is like an accelerant; if we liken the work of rescuing youth and prosecuting pimps and their exploiters as a fire, allowing the advertising of youth on the Internet for the pleasure of others is like adding fuel to the fire—it becomes too

much, and near impossible to rescue these children." Dkt. # 4, Ex. 2, p. 11.

Although Defendants have a compelling interest in curbing the sexual exploitation of minors in Washington state, Defendants do not acknowledge that the statute reaches protected speech, and therefore fail to show that SB 6251 is the least restrictive means available to forward their compelling interest. For example, Defendants fail to demonstrate why a law targeting only the individuals who post ads would not be effective, rather than seeking to impose felony liability on online service providers and other parties "directly or indirectly" involved in the dissemination of proscribed content.

Nor do Defendants address the many underinclusiveness arguments lodged by Plaintiffs. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Ass'n*, —— U.S. ——, 131 S.Ct. 2729, 2740, 180 L.Ed.2d 708 (2011). Because the statute requires that a defendant publish an advertisement containing a "depiction" of a minor, defendants could easily escape liability by simply excluding such depictions, depicting adults who appeared to be minors, or depicting cartoon characters or inanimate objects. Thus, a post that advertised "sex with a fifteen year old—$100" would not fall under the statute as long as it did not include a picture of that 15–year–old. Potential defendants could also easily escape liability by submitting forged identification or the identification of third persons, since the statute does not require that the identification include a photograph of the person depicted in the advertisement. *See Ashcroft v. ACLU*, 542 U.S. at 666, 124 S.Ct. 2783 (noting that age verification systems could be subject to evasion). Finally, even if SB 6251 succeeded in diminishing the amount of advertising for child prostitution on websites based in the United States, it could not prevent similar websites from appearing overseas. Given the global nature of the Internet, it would be no more difficult for potential defendants to post advertisements on foreign websites than it would be for them to post advertisements on websites located in the United States. *See id.* (noting that a statute regulating material harmful to minors had diminished effectiveness because "the providers of the materials that would be covered by the statute simply can move their operations overseas").

"Speech shielded by the [First] amendment's protective wing must remain inviolate regardless of its inherent worth. The distaste we may feel as individuals toward the content or message of protected expression cannot, of course, detain us from discharging our duty as guardians of the Constitution." *U.S. v. U.S. District Court for the Central District of California*, 858 F.2d at 541 (citations omitted). For all of the reasons stated above, the Court finds that Defendants are unlikely to succeed in meeting their burden of showing that SB 6251 is the least restrictive means of advancing their compelling interest in curbing the sexual exploitation of minors.

\* \* \*

"The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace." *Alvarez*, 132 S.Ct. at 2551. While the Washington legislature might pass a law that effectively and constitutionally regulates the opprobrious content that victimizes the children of our communities, SB 6251 is not that statute. The Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claims on all three grounds.

### c. Commerce Clause

Plaintiffs' final claim is that SB 6251 violates the Commerce Clause. The Commerce clause provides: "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has long recognized that this affirmative grant of authority to Congress also encompasses an implicit or "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce. *See, e.g., Healy v. Beer Institute, et al.,* 491 U.S. 324, 326, and n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), *Hughes v. Oklahoma,* 441 U.S. 322, 326, and n. 2, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *HP. Hood & Sons, Inc. v. DuMond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 93 L.Ed. 865 (1949). Plaintiffs argue that SB 6251 violates the dormant commerce clause because it regulates conduct that takes place wholly outside the state and because it regulates a unique aspect of interstate commerce that demands national treatment.

A state cannot regulate conduct that takes place exclusively outside the state. *Healy,* 491 U.S. at 336, 109 S.Ct. 2491. Where a state statute only has incidental effects on interstate commerce, the statute will be upheld "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest," where "its effects on interstate commerce are only incidental," and where the burden imposed on interstate commerce is not "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). "[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy,* 491 U.S. at 336, 109 S.Ct. 2491. Finally, there exist unique aspects of commerce that demand national treatment. *See, e.g., Wabash, St. L. & P. Ry. Co. v. Illinois,* 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886) (holding railroad rate exempt from state regulation).

SB 6251 likely violates the dormant commerce clause under each of the three tests articulated above. First, although SB 6251 defines "advertisement for a commercial sex act" as an offer for a sex act "to occur in Washington," the advertisement itself may occur entirely outside of the state and no act need take place in the state of Washington to trigger liability under the statute. Therefore it is a statute that regulates conduct that occurs wholly outside of the state of Washington.

Second, the out-of-state burden will be significant. To escape liability, online service providers that post content that *might* be construed as containing "implicit" offers for sex (including aggregators like IA, social networking sites like Facebook.com, and dating sites like Match.com) will be required to collect government-issued identification, lest one of these offers relates to conduct occurring in Washington. Such a screening process would constitute a significant and costly change to the business operations of these corporations that have little to no connection with the State of Washington. Such a burden would be exponentially exacerbated if every state were permitted to legislate its own requirements. In contrast, Washington's interest in prosecuting wrongdoers is undermined by the practical obstacles to exercising jurisdiction over defendants whose criminal acts take place outside the state. *See ACLU v. Johnson,* 194 F.3d 1149, 1161–62 (10th Cir.1999) (holding that a New Mexico statute that criminalized "dissemination" of materials

that are "harmful to minors" violated the Commerce Clause because "the nature of the Internet" made it impossible for the statute to reach purely intrastate conduct and the benefits to be achieved were limited).

Third, and for all of these reasons, the Internet is likely a unique aspect of commerce that demands national treatment. "The Internet is wholly insensitive to geographic distinctions" and itself "represents an instrument of interstate commerce." *Amer. Libraries Assoc. v. Pataki,* 969 F.Supp. 160, 173 (S.D.N.Y.1997). *See also Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666 (7th Cir.2008) ("Online services are in some respects like the classified pages of newspapers, but in others they operate like common carriers such as telephone services."). Thus, "[t]he Internet, like ... rail and highway traffic ..., requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." *Pataki,* 969 F.Supp. at 182; *cf. Wabash, St. L. & P. Ry. Co. v. Illinois,* 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886) (holding railroad rate exempt from state regulation). Therefore, Plaintiffs are likely to succeed on their claims that SB 6251 violates the dormant Commerce Clause.

### 4. *Remaining Preliminary Injunction Requirements*

Having shown a likelihood of success on the merits, Plaintiffs adequately satisfy the remaining elements for securing a preliminary injunction: irreparable harm, that the balance of equities tips in their favor, and that an injunction would be in the public interest. *See Winter,* 555 U.S. at 24, 129 S.Ct. 365. First, "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Thalheimer,* 645 F.3d at 1128 (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49

L.Ed.2d 547 (1976)). In addition, because the age verification mechanism described in the law only provides an affirmative defense, even full compliance with SB 6251 cannot guarantee freedom from prosecution. *Id.* at 674, 124 S.Ct. 2783 (J. Stevens, concurring) ("Speakers who dutifully place their content behind age screens may nevertheless find themselves in court, forced to prove the lawfulness of their speech on pain of criminal conviction.").

Second, the balance of equities tips in Plaintiffs' favor. The harm to the Government will not be great. "No prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." *Id.* at 671, 124 S.Ct. 2783. While the injunction is upheld, Washington can enforce other laws banning prostitution and the exploitation of minors.

Third, an injunction is in the public interest. This is because, "[w]here a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. ACLU,* 542 U.S. at 670–671, 124 S.Ct. 2783.

### III. CONCLUSION

Having considered Plaintiffs' motions, the responses and replies thereto, all declarations and attached exhibits, and having heard the parties at oral argument, the Court hereby finds and orders:

(1) Plaintiffs' motions for a preliminary injunction are hereby GRANTED. The parties shall submit a joint proposed order preliminarily enjoining enforcement of SB 6251 within ten (10) days. The preliminary injunction will remain in place until such time as the Court is able to reach a decision on the merits. Until the Court has received and signed the

parties joint proposed order, the temporary restraining order currently in place (Dkt. # 7) shall remain in effect.

(2) The Clerk of the Court is directed to forward a copy of this order to all counsel of record.