# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60205

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2016

Lyle W. Cayce
Clerk

GOOGLE, INCORPORATED,

      Plaintiff - Appellee

v.

JAMES M. HOOD, III, Attorney General of the State of Mississippi, in his official capacity,

      Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, KING and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

In response to Google's petition for panel rehearing, the opinion of the court issued on April 8, 2016, at --- F.3d ---, 2016 WL 1397765, is withdrawn, and the following is substituted. The petition for rehearing is otherwise DENIED.

Mississippi's Attorney General, James M. Hood III, believes that internet giant Google may be liable under state law for facilitating dangerous and unlawful activity through its online platforms. Hood's conflict with Google culminated in his issuance of a broad administrative subpoena, which Google challenged in federal court. The district court granted a preliminary injunction

No. 15-60205

prohibiting Hood from (1) enforcing the administrative subpoena or (2) bringing any civil or criminal action against Google "for making accessible third-party content to internet users." Hood appeals, arguing that the district court should have dismissed Google's suit on a number of threshold grounds, and in any event erred in granting injunctive relief. Expressing no opinion on the merits, we vacate the injunction.

I.

This dispute concerns the adequacy of Google's efforts to police the technology services it provides to tens of millions of people every day.

A.

Google's leading internet search engine processes over 3.5 billion searches per day, finding webpages responsive to users' queries through an algorithmic review of billions of pages selected from over 60 trillion indexed pages.[1] Google also operates YouTube, a popular platform for uploading and viewing videos to which nearly 300 new hours of content are added every minute. Both services feature Google's "Autocomplete" function, which uses an algorithm based on prior search activity and the content of indexed pages to predict a query as it is typed. This feature, according to Google, is intended to save time and correct common misspellings. The user may select one of the suggested queries to run a search, or ignore the suggestions and keep typing.

Google earns revenue through services called AdWords, which places third-party advertisements alongside search results and YouTube videos, and AdSense, which allows third-party websites to host advertisements generated

---

[1] These and other statistics cited in this opinion reflect evidence filed with the district court in 2014, and may be outdated. A "webpage" is a single "document on the World Wide Web, consisting of a hypertext file and any related files for scripts and graphics, and often hyperlinked to other documents on the Web." *Webpage*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 1963 (5th ed. 2011). A "website" is "[a] set of interconnected webpages." *Website*, *id.*

No. 15-60205

through AdWords. Over 40 million AdWords advertisements are created each day. The order in which they appear to users depends on, among other factors, how much the advertiser pays and the "quality" of the advertisements and linked websites

Although the vast majority of the content users find through Google's services is produced by third parties, Google takes measures to weed out illegal material. For example, when Google receives a valid "takedown notice" from a copyright owner about a webpage containing unauthorized material, or when a court rules content unlawful, Google removes the offending page from its search results. In 2013 alone, Google removed 222 million pages from its search results as a result of takedown notices. Though it generally does not remove whole *sites* on the basis of infringing *pages*, Google "incorporates" copyright removal notices as a negative factor in the search algorithm it uses to rank sites. The company also removes from its search results limited content such as personal financial information and images showing sexual abuse of children. And Google blocks predictive Autocomplete queries for narrow "cases of potentially shocking or offensive entries (*e.g.*, hate speech) and in cases where there is a high correlation between particular terms and infringing copyright."[2]

Videos that violate YouTube's terms and conditions can be removed in several ways. Users can flag videos, which are then reviewed and, if they violate Google's guidelines, taken down. Google also removes videos in response to valid legal complaints and uses computer models to identify large-scale policy violations. Additionally, a system called Content ID allows copyright owners to "identify and manage their content on YouTube" by

---

[2] In other countries, Google further limits search results in accordance with "local law." For example, Google removes Nazi-related content from its Germany-based search engine and "insults to religion" from its India-based search engine.

sending YouTube a database of copyrighted files.  When a newly uploaded video matches such a file, the copyright owner can choose to mute, block, monetize, or track that video.  User accounts can be terminated for egregious or repeated violations.

Google's AdWords policies prohibit advertising for, among other things, counterfeit goods, "dangerous products or services" including recreational drugs and weapons, "products that are designed to enable dishonest behavior" such as hacking software, and hate-promoting or otherwise "offensive or inappropriate content."  Google restricts (but does not prohibit) advertising for "adult-oriented content," alcoholic beverages, intellectual-property-violative material, and healthcare-related content (including over-the-counter and prescription medication).    In 2014, Google rejected over 428 million advertisements and suspended or terminated over 900,000 advertiser accounts for AdWords policy violations.  Similar policies govern AdSense.

## B.

In late 2012 and early 2013, Hood and other state attorneys general began expressing concern that search engines were not doing enough to combat copyright infringement, the sale of prescription drugs and counterfeit products, and other "illegal and harmful" activity on the internet.  In April 2013, Hood's office wrote to Google about these topics, alleging that the company had inadequately responded to previous requests for information, showing an "unwillingness to make meaningful reforms" and "a lack of commitment to making the Internet a safe place for families and commerce."  Hood complained that, among other things, children were "able to purchase drugs without a prescription through Google," and that "sites peddling counterfeit and pirated goods are still appearing at the top of" search results.  Hood expressed a desire to meet with Google to develop solutions, but warned that "if voluntary actions will not suffice, we will take legal action."  As it had before, Google responded,

highlighting its existing efforts to counter illegal activity online and explaining why, in its view, more severe measures were inappropriate.

Friction between the parties escalated. In May 2013, Hood threatened that if the company did not "provide adequate answers," he would urge his fellow attorneys general to issue civil investigative demands (subpoenas) to the company. He also demanded a "24-hour link" through which requests by attorneys general to remove webpages from Google's searchable index would be "granted or addressed within hours." About a month later, Hood sent Google's counsel a letter requesting a litigation hold, explaining that Mississippi was "investigating and evaluating Google's conduct related to its search algorithm, auto-complete feature, advertising policies, and any other related functions," with the purpose of "determin[ing] whether there exist any violations of Mississippi law." "One of the many potential outcomes of the ongoing investigation," Hood warned, "could be civil or criminal litigation."

At a subsequent meeting of attorneys general, Hood called on his colleagues to issue subpoenas in an effort to "force [Google] to come to the table in earnest and make these changes and admit what they've done" and "block . . . some of the search results that are coming to the top ahead of . . . legitimate sites." Google wrote to Hood about these remarks, arguing that its existing practices were lawful, that more stringent measures against illegal content would be inconsistent with free speech values and the practices of similar companies, and that federal law immunized Google from liability for the complained-of conduct.

In November 2013, Hood sent another letter criticizing Google and demanding that the company (1) promote in its search results "sites [that] have been authorized to provide content"; (2) mark such "authorized" sites in search results; (3) remove entire websites "substantially dedicated to intellectual property infringement" from its search index; (4) refuse to index new pages

5

from websites "for which Google has received multiple notices of infringement"; (5) "dramatically" demote "rogue" infringement sites in search results; and (6) warn users before it "permits them to link from Google to rogue sites." Hood rejected the notion that Google was immune from legal action, stating that Google was being investigated for its "own conduct" and was "not a mere publisher of third-party content when it suggests search terms through Autocomplete," profits from YouTube videos involving illegal activity, or builds its search algorithms. Hood repeated similar criticisms and demands at public meetings in early 2014, as the parties continued to exchange letters.

Google has made some changes in response to Hood's investigation. It created a "trusted flag" mechanism through which Google promptly reviewed videos Hood's office complained about. After being trained on that tool, Hood's office flagged seven videos, six of which Google quickly took down. When asked by the district court, Hood's counsel could not identify any investigatory efforts related to the videos his office flagged. His office has nevertheless asked that Google immediately remove flagged videos pending review and "consider implementing a more comprehensive content evaluation process." Google has also blocked certain Autocomplete predictions and no longer permits advertisements on videos relating to "health and pharmacy" topics.

C.

In October 2014, Hood made good on his threats to issue an administrative subpoena, which stated broadly that there were "reasonable grounds to believe that Google Inc. may have violated . . . the Mississippi Consumer Protection Act," Miss. Code. Ann. § 75-24-1, *et seq.* The administrative subpoena sought information on Google's platforms, advertising practices, and knowledge of and efforts to police "dangerous" or "illegal" content such as prescription or illicit drug sales, drug abuse, credit card leaks, fraudulent identification documents, human trafficking, and

No. 15-60205

copyright infringement.  And it demanded a response by mail to a post office box within thirty days, warning that if Google did not comply, Hood "may apply to" a state court "for an order compelling compliance in accordance with Miss. Code Ann. § 75-24-17."

The administrative subpoena, which totals 79 pages and includes 69 interrogatories and 141 document requests, is written expansively.  For example, many of its requests pertain to conduct by which Google or third parties "aid," "abet," "assist," "facilitate," "encourage," or "promote" content or conduct that is "dangerous" or "unlawful."  These verbs are all defined as

> the doing of any act, including the act of hosting or displaying search results, content or advertisements, that could possibly directly, indirectly or tangentially further or advance a course of action by any actor or actors, regardless of whether or not the act or acts would be protected or immunized under the Communications Decency Act, 47 United States Code ("U.S.C."), § 230.  These terms should be construed broadly . . .

 "Dangerous content or conduct," in turn,

> means content, conduct, or information that in itself is dangerous or has indicia that it could, in any way, either directly, indirectly or tangentially, aid, abet, assist, facilitate, encourage or promote activity that could lead to physical harm or injury and takes into account all facts and circumstances, including the age of the intended audience.

Similarly, "illegal" or "unlawful" "content or conduct"

> means content, conduct, materials or any information that is itself in violation of any criminal or civil law of the United States or that of any state or territory or has indicia that it could, either directly, indirectly or tangentially, promote, facilitate, encourage, aid, or abet activity that could be in violation of any criminal or civil law of the United States or that of any state or territory.

Some of the administrative subpoena's requests would require massive document production.  For example, one seeks "all documents concerning any actions considered, taken, or not taken to remove videos . . . that appear to be

7

No. 15-60205

promoting, offering for sale, disseminating, engaging in or facilitating Dangerous or Illegal Content/Conduct," without temporal limitation. For context, in 2014 alone, Google removed or blocked over 180 million videos for policy violations. Many requests lack temporal limitations as well. Google executives aver that responding to the administrative subpoena "would be incredibly burdensome, in terms of time and resources."

The parties agreed to extend the return date to January 5, 2015, and that Google would in the meantime voluntarily share some materials. Google then shared approximately 100,000 pages of documents. Google claims that those documents show third parties created all of the content that the administrative subpoena identifies as objectionable. On December 17, 2014, Hood's office rebuffed Google's requests to narrow the administrative subpoena's temporal scope and exclude subject matters Google maintains are immunized by or are exclusively the province of federal law.

### D.

On December 19, 2014—without further responding to the administrative subpoena or seeking relief in state court—Google filed this lawsuit. Google alleges that Hood's investigation violates Google's immunity under the Communications Decency Act (CDA), its Fourth Amendment rights, and the First Amendment rights of Google and its users. Google contends that "any further steps [Hood] takes to fulfill his threats of a criminal prosecution, civil litigation, and/or enforcement proceeding against Google under Mississippi law for making accessible third-party content to Internet users would further violate" these rights. Google also alleges that federal law preempts Hood's "[i]nquiry, insofar as it pertains to possible copyright infringement or the importation of prescription drugs."

On the same day it filed its complaint, Google moved for a temporary restraining order and a preliminary injunction. Hood filed an opposition and

No. 15-60205

a motion to dismiss. The district court held a hearing at which each side offered legal argument but neither put on testimony. The court then denied Hood's motion to dismiss and preliminarily enjoined him from (1) enforcing the administrative subpoena, or (2) "bringing a civil or criminal charge against Google under Mississippi law for making accessible third-party content to Internet users (as threatened)." This appeal followed.

## II.

A preliminary injunction is an "extraordinary remedy" that should not be granted unless its proponent clearly shows: "(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003). We review the district court's determination on each of these elements for clear error, its conclusions of law de novo, and the ultimate decision whether to grant relief for abuse of discretion. *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).

Our review of subject-matter jurisdiction is plenary and de novo. *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 772 (5th Cir. 2003). "Although we review a district court's abstention ruling for abuse of discretion, we review de novo whether the requirements of a particular abstention doctrine are satisfied." *Tex. Ass'n of Bus. v. Earle*, 388 F.3d 515, 518 (5th Cir. 2004) (quoting *Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.*, 283 F.3d 650, 652 (5th Cir. 2002)).

## III.

This lawsuit, like others of late, reminds us of the importance of preserving free speech on the internet, even though that medium serves as a

conduit for much that is distasteful or unlawful. *See Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (holding unconstitutional a sheriff's threats to credit card companies to stop doing business with a website that hosts classified ads for prostitution). Also like other recent litigation, this case implicates section 230 of the Communications Decency Act—Congress's grant of "broad immunity" to internet service providers "for all claims stemming from their publication of information created by third parties," which we and other circuits have consistently given a wide scope. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *see also Doe v. Backpage.com, LLC*, 817 F.3d 12, 18–24, 29 (1st Cir. 2016) (affirming dismissal based on section 230 despite appellants' "persuasive case" that the defendant "tailored its website to make sex trafficking easier," and stating: "If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the CDA, the remedy is through legislation, not through litigation.").[3] Yet we are also cognizant that an injunction is an equitable remedy that should only issue when essential to prevent an otherwise irreparable injury. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982); *Lake Charles Diesel*, 328 F.3d at 195–96. With these principles in mind, we turn to the parties' arguments.

A.

We first reject Hood's contention that we can resolve this case on the simple ground that the district court lacked federal-question jurisdiction. Federal courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. We

---

[3] Legislatures have indeed become entangled in these issues. *See* John D. McKinnon, *Senate Holds Classified-Ad Site Backpage.com in Contempt*, WALL ST. J. (Mar. 17, 2016), http://www.wsj.com/articles/senate-holds-classified-ad-site-backpage-com-in-contempt-1458241526 (reporting on contempt resolution authorizing the Senate's legal counsel to bring a federal enforcement action concerning subpoenas that a controversial website company, relying on the First Amendment and the CDA, has refused to comply with).

apply the "well-pleaded complaint rule" to determine whether a suit arises under federal law, asking "whether the plaintiff has affirmatively alleged a federal claim." *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 328 (5th Cir. 2008). As a corollary, "anticipated or potential defenses, including defenses based on federal preemption, do not provide a basis for federal question jurisdiction." *Id.* Here, Google brings four claims under 42 U.S.C. § 1983 alleging violations of the United States Constitution and federal statutory law. This satisfies the well-pleaded complaint rule.

Focusing on Google's claims for declaratory relief, Hood protests that Google really presents only artfully pleaded anticipated defenses to a future state-law action—but he is wrong, as illustrated by our recent decision in *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389 (5th Cir. 2015). There, the Texas Attorney General determined that NiGen's dietary supplements were misleadingly labeled in violation of state law. He sent NiGen and its retailers letters "intimating that formal enforcement was on the horizon"; as a result, the retailers stopped selling the accused products. 804 F.3d at 392. NiGen sought federal declaratory and injunctive relief, but the Attorney General argued that all of NiGen's claims were "essentially anticipatory defenses to the threatened enforcement action." *Id.* at 392, 395. We disagreed, explaining that when a plaintiff seeks both declaratory and injunctive relief from allegedly unconstitutional state action, the well-pleaded complaint rule as adapted to declaratory actions "does not prevent that plaintiff from establishing federal jurisdiction." *Id.* at 395–96. Here too, Google's claims seeking to enjoin a state officer's alleged violations of federal law invoke federal-question jurisdiction. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."); *Major League Baseball v. Crist*, 331 F.3d 1177, 1182 (11th Cir. 2003) (holding that federal-question jurisdiction existed

No. 15-60205

over § 1983 claims that a state attorney general's investigative subpoena was preempted by federal law).[4]

## B.

We next consider whether the district court should have abstained under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), which applies to suits for injunctive and declaratory relief. *See Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 86 (5th Cir. 1992).

*Younger* established that federal courts should not enjoin pending state criminal prosecutions unless the plaintiff shows "bad faith, harassment, or any other unusual circumstances that would call for equitable relief," such as a "flagrantly and patently" unconstitutional state statute. *Younger*, 401 U.S. at 53–54. The doctrine reflects the principle that equitable remedies are inappropriate "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. It also protects our federal system's "notion of 'comity,' that is, a proper respect for state functions." *Id.* at 44. As the Supreme Court has explained, interference with state judicial proceedings "prevents the state . . . from effectuating its substantive policies . . . . results in duplicative legal proceedings, and can readily be interpreted 'as reflecting negatively upon the state courts' ability to enforce constitutional principles.'" *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)).

---

[4] The remainder of Hood's purported federal-question jurisdiction arguments fail, as they relate to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974))); *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1998) (explaining that whether a federal statute is enforceable through § 1983 is a merits question that "does not implicate jurisdiction").

No. 15-60205

Although *Younger* has been expanded beyond the criminal context, abstention is not required in every case of "[p]arallel state-court proceedings." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013). Rather, as the Supreme Court recently clarified, it applies only to "three 'exceptional' categories" of state proceedings: ongoing criminal prosecutions, certain civil enforcement proceedings akin to criminal prosecutions,[5] and "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'"[6]  *Id.* at 588, 591 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989)).  If state proceedings fit into one of these categories, a court "appropriately consider[s] . . . before invoking *Younger*" whether there is "(1) 'an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provides an adequate opportunity to raise federal challenges.'" *Id.* at 593 (brackets omitted); *see Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

The district court did not err in declining to abstain because there was no "ongoing state judicial proceeding" fitting one of *Younger*'s three categories. "[A]bstention from the exercise of federal jurisdiction," it must be remembered, "is the 'exception, not the rule.'" *Sprint*, 134 S. Ct. at 593 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)).  And *Younger* does not apply merely because "a state bureaucracy has initiated contact with a putative federal plaintiff," *La. Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483,

---

[5] *See, e.g.*, *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 623–28 (1986) (enforcement action before civil rights commission); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–35 (1982) (bar disciplinary proceedings); *Huffman*, 420 U.S. at 595–97, 611–12 (state-instituted public nuisance proceeding).

[6] *See, e.g.*, *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 3, 13 (1987) (execution of state-court judgment pending appeal); *Juidice v. Vail*, 430 U.S. 327, 330, 334–37 (1977) (state civil contempt procedures for judgment debtors).

1491 (5th Cir. 1995) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989)), or "a state investigation has begun," *Mulholland v. Marion Cty. Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014).  In *Louisiana Debating*, for example, a city commission with the power to issue cease-and-desist orders notified four private clubs of discrimination complaints, told them that the commission had the power to adjudicate or conciliate those complaints, and requested certain information.  42 F.3d at 1487.  The clubs filed § 1983 actions seeking declaratory and injunctive relief on the ground that the city's anti-discrimination ordinance could not be applied to them consistent with the First Amendment.  *Id.* at 1488.  We affirmed the district court's decision not to abstain, noting that the state action had not progressed nearly as far as in the Supreme Court's cases applying *Younger* to state agency proceedings in which the state had already "investigated the allegations, made determinations that probable cause existed, and served formal charges."  *See id.* at 1490–91.

Here, we cannot agree with Hood that an executive official's service of a non-self-executing subpoena creates an "ongoing state judicial proceeding." As of now, Hood has not moved to enforce the administrative subpoena in any state court, nor has any judicial or quasi-judicial tribunal begun proceedings against Google.  *See Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (holding *Younger* abstention clearly erroneous "[a]bsent any *pending* proceeding in state tribunals").  Our holding that *Younger* does not apply comports with the doctrine's underlying principles because, in the absence of any pending state judicial proceeding, federal intervention would not "result in duplicative legal proceedings" or "reflect[] negatively upon [a] state court's ability to enforce constitutional principles." *Steffel*, 415 U.S. at 462.

Our decision in *Earle*, 388 F.3d at 515, does not compel a different conclusion.  There, we considered "whether state *grand jury proceedings* in which subpoenas have been issued constitute an 'ongoing state proceeding'

14

such that abstention is warranted." *Id.* at 519 (emphasis added). Crucial to our affirmance of the district court's abstention was that a Texas grand jury "is said to be 'an arm of the court by which it is appointed.'" *Id.* at 521 (quoting *Dall. Cty. Dist. Att'y v. Doe*, 969 S.W.2d 537, 542 (Tex. App. 1998)). Indeed, a Texas court (1) "impanels the grand jury after testing the qualifications of its members;" (2) "administers the jurors' oath, and instructs them as to their duties"; (3) advises the grand jury "on any matter it is considering"; and (4) issues and enforces any subpoena sought to be issued by the grand jury. *Id.* These factors are not present here. An executive official who frequently appears as an adversarial litigant in state courts is not an "arm" of the judiciary, and the administrative subpoena here has not been issued or enforced by any court. For these reasons, *Earle* does not control our analysis.[7]

Other courts' decisions support our conclusion that *Younger* does not apply. Most on point, one district court found that there was no ongoing judicial proceeding where a state attorney general issued civil investigative demands to professional baseball teams, reasoning: "Unless and until someone

---

[7] Nor are we persuaded by the out-of-circuit cases Hood cites. He relies most heavily on *J. & W. Seligman & Co. v. Spitzer*, which held that a state attorney general's issuance of an investigative subpoena initiated an ongoing proceeding for *Younger* purposes. No. 05 Civ. 7781 (KMW), 2007 WL 2822208, at *5 (S.D.N.Y. Sept. 27, 2007). Most of the cases on which that district court decision relied involved grand-jury subpoenas or judicially issued search warrants, both of which—unlike an administrative subpoena issued without prior court approval—involve proceedings before a neutral court or an arm thereof. The court disregarded this distinction because "the information sought may be used to initiate civil or criminal proceedings," *id.*—but that logic would apply to *any* investigative step, and courts need not abstain in the face of a mere investigation. *See Mulholland*, 746 F.3d at 817 ("The possibility that a state proceeding may lead to a future prosecution of the federal plaintiff is not enough to trigger *Younger* abstention; a federal court need not decline to hear a constitutional case within its jurisdiction merely because a state investigation has begun."). The Eighth Circuit has held that abstention was required by subpoenas issued pursuant to Arkansas law under which a prosecutor "takes the place of a grand jury." *Kaylor v. Fields*, 661 F.2d 1177, 1182 (8th Cir. 1981) (quoting *Johnson v. State*, 133 S.W.2d 15, 18 (Ark. 1939)). But Hood has cited no comparable Mississippi law and, since *Kaylor*, the Supreme Court has clarified the limited reach of *Younger*—including in a recent opinion correcting the Eighth Circuit's overly broad reading of the doctrine. *See Sprint*, 134 S. Ct. at 593.

files a proceeding in court, CIDs are simply part of an executive branch investigation." *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1321 n.2 (N.D. Fla. 2001), *aff'd sub nom. Major League Baseball v. Crist*, 331 F.3d 1177 (11th Cir. 2003). Also, the First Circuit refused to apply *Younger* where Puerto Rico's Insurance Commissioner had, as part of a multi-year investigation, issued subpoenas that did not require prior court approval. *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 511–12, 519 (1st Cir. 2009). That court drew on a Fourth Circuit decision in articulating a "rule[] requiring the commencement of 'formal enforcement proceedings' before abstention is required." *Id.* at 519–20 (quoting *Telco*, 885 F.2d at 1229).[8] We do not articulate any bright-line rule, but we do hold that the issuance of a non-self-executing administrative subpoena does not, without more, mandate *Younger* abstention.

C.

Despite the foregoing, our precedents lead us to conclude that this administrative subpoena was not ripe for adjudication by the district court. This follows from our cases considering federal administrative subpoenas that, as here, were non-self-executing—that is, the issuing agency could not itself sanction non-compliance. In one case, the recipient of investigatory Federal Trade Commission subpoenas sought injunctive and declaratory relief against their enforcement. *Atl. Richfield Co. v. F.T.C.*, 546 F.2d 646, 647 (5th Cir. 1977). Stressing that the subpoenas were "not self-executing and [could] only be enforced by a district court," we held that pre-enforcement relief would be "inappropriate." *Id.* at 649. We reasoned that, if and when the FTC moved to enforce the subpoenas as contemplated by statute, the recipient would have an

---

[8] *See also ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 140 (3d Cir. 2014) (noting in dicta that all of the Supreme Court's *Younger* cases involved "some type of formal complaint or charges").

adequate remedy at law.  Until then, the recipient would "suffer no undue hardship from denial of judicial relief" because it could not absent a court order "be forced to comply with the subpoenas nor subjected to any penalties for noncompliance."  *Id.* at 650; *accord Anheuser-Busch, Inc. v. F.T.C.*, 359 F.2d 487 (8th Cir. 1966) (Blackmun, J.).

We applied the same logic when the recipient of an administrative subpoena issued by the Immigration and Naturalization Service moved to quash it in federal court.  *In re Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990).  The operative statute gave the INS no power to enforce its own subpoenas, but authorized district courts to issue orders requiring compliance on pain of contempt.  *Id.* at 98 & n.2.  Though both parties thought the case properly before the district court, we disagreed, stating: "Where an agency must resort to judicial enforcement of its subpoenas, courts generally dismiss anticipatory actions filed by parties challenging such subpoenas as not being ripe for review because of the availability of an adequate remedy at law if, and when, the agency files an enforcement action."  *Id.* at 98.  Because the government had not filed an enforcement action, this court held that the "motion to quash was not ripe for judicial action . . . and . . . should have been dismissed for lack of subject matter jurisdiction."  *Id.* at 100; *see also Reisman v. Caplin*, 375 U.S. 440, 443–46 (1964) (holding that a pre-enforcement challenge to a non-self-executing Internal Revenue Service summons was "subject to dismissal for want of equity"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35  (10th Cir. 1984) (finding no subject-matter jurisdiction over pre-enforcement challenge to investigative subpoena and citing *Reisman* as "announc[ing] a rule strongly disfavoring any pre-enforcement review of investigative subpoenas").

The situation here is much the same.  The statute under which this administrative subpoena was issued gives Hood no authority to enforce it;

instead, if the recipient refuses to comply, the Attorney General "may, after notice, apply" to certain state courts "and, after hearing thereon, request an order" granting injunctive or other relief and enforceable through contempt. Miss. Code Ann. § 75-24-17. This procedure parallels those in the statutes at issue in *Atlantic Richfield*, 546 at 649 n.3, and *Ramirez*, 905 F.2d at 98 n.2. Hood has not brought an enforcement action.[9] And Google does not contest Hood's assertions that it could raise its objections to the administrative subpoena if Hood ever brings an enforcement proceeding.[10] The only real difference is that we have before us a state, not federal, subpoena. But we see no reason why a state's non-self-executing subpoena should be ripe for review when a federal equivalent would not be. If anything, comity should make us less willing to intervene when there is no current consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court. *See O'Keefe v. Chisholm*, 769 F.3d 936, 939–42 (7th Cir. 2014) (finding that a federal plaintiff's ability to litigate subpoena in state court counseled against injunctive relief even though the district court reasoned that the defendants' "bad faith" conduct justified an injunction).

---

[9] *Cf. Sheridan v. Garrison*, 273 F. Supp. 673, 675–85 (E.D. La. 1967) (Rubin, J.) (enjoining enforcement of subpoena where plaintiff had been formally charged with an offense, had made "every effort" to challenge the subpoena in state court but had been denied relief, and faced contempt for refusing to testify before grand jury without an attorney present), *rev'd in part on other grounds*, 415 F.2d 699 (5th Cir. 1969).

[10] Perhaps because they are not yet implicated, the parties do not address the standards or procedures for challenging an administrative subpoena in Mississippi's courts. We note that Mississippi law expressly provides for the quashing of court-issued subpoenas that seek "privileged or other protected matter," subject the recipient "to undue burden or expense," or are issued in "bad faith." Miss. R. Civ. P. 45(d)(1)(A), (f). And we will of course not presume that Mississippi courts would be insensitive to the First Amendment values that can be implicated by investigatory subpoenas, *see United States v. R. Enters., Inc.*, 498 U.S. 292, 303 (1991); *id.* at 306–07 (Stevens, J., concurring), or to the general principle that "[c]ourts will not enforce an administrative subpoena . . . issued for an improper purpose, such as harassment," *Burlington N. R.R. Co. v. Office of Inspector General*, 983 F.2d 631, 638 (5th Cir. 1993) (citing *United States v. Powell*, 379 U.S. 48, 58 (1964)).

No. 15-60205

Because the administrative subpoena is not ripe for review, we hold that the district court should have rejected Google's pre-enforcement challenge.

D.

The district court enjoined Hood not only from enforcing the administrative subpoena, but also from "bringing a civil or criminal charge against Google under Mississippi law for making accessible third-party content to Internet users." Mindful that an injunction is an "extraordinary remedy" that should not issue absent a substantial threat that the movant will suffer irreparable injury without one, *Lake Charles Diesel*, 328 F.3d at 195–96, we are persuaded that the district court should not have granted this relief at this juncture.

In *Morales v. Transworld Airlines*, the Supreme Court affirmed on federal preemption grounds an injunction against enforcement, under state consumer protection law, of written guidelines "containing detailed standards governing" air fare advertising—which Texas had told airlines they were violating through "formal notice[s] of intent to sue." 504 U.S. 374, 378–80, 391 (1992) (alteration in original). But the Court also held that the district court had "disregarded the limits on the exercise of its injunctive power" by enjoining the attorney general from "initiating any enforcement action . . . which would seek to regulate or restrict any aspect of the . . . plaintiff airlines' air fare advertising or the operations involving their rates, routes, and/or services." *Id.* at 382. The Court explained:

> In suits such as this one, which the plaintiff intends as a "first strike" to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury. *Ex parte Young* thus speaks of enjoining state officers "*who threaten and are about to commence proceedings,*" and we have recognized in a related context that a conjectural injury cannot warrant equitable relief. Any other rule (assuming it would meet Article III case-or-

19

controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable. This problem is vividly enough illustrated by the blunderbuss injunction in the present case, which declares pre-empted "any" state suit involving "any aspect" of the airlines' rates, routes, and services. As petitioner has threatened to enforce only the obligations described in the guidelines regarding fare advertising, the injunction must be vacated insofar as it restrains the operation of state laws with respect to other matters.

*Id.* at 382–83 (citations omitted).

Unlike with the relief upheld in *Morales*, we do not have a formal notice of intent to sue for specific conduct.[11] Rather, as with the relief vacated in *Morales*, this injunction covers a fuzzily defined range of enforcement actions that do not appear imminent. We cannot on the present record predict what conduct Hood might one day try to prosecute under Mississippi law. Hood's complaints to Google and the public have been wide-ranging, and as Google stresses in its brief, the administrative subpoena is a "pre-litigation investigative tool" seeking information on a broad variety of subject matters—ranging from alleged facilitation of copyright infringement, illegal prescription drug sales, human trafficking, the sale of false identification documents, and credit card data theft. Further, whether a defendant's actions exclusively consist of "making accessible third-party content to Internet users," the main qualifying language in this injunction, is not always readily determinable even after a complaint is brought. *See CYBERsitter, LLC v. Google, Inc.*, 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012) (denying Rule 12(b)(6) motion based on

---

[11] Also, because it lacks a concrete and imminent threat of prosecution and challenges the anticipated application of a general consumer protection law, this case has little in common with those in which courts have enjoined threatened enforcement of state statutes specifically passed to target a website accused of facilitating sex trafficking through its online classified ads. *See Backpage.com, LLC v. Hoffman*, No. 13-cv-03952 (DMC)(JAD), 2013 WL 4502097 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012).

No. 15-60205

CDA immunity); *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM (SHx), 2008 WL 4217837, at *8 (C.D. Cal. July 16, 2008) ("The question whether any of Google's conduct disqualifies it for immunity under the CDA will undoubtedly be fact-intensive.").[12]

True enough, a federal lawsuit can sometimes proceed on the basis of a merely threatened prosecution. But unlike in, say, *Steffel*—where the plaintiff was told he would be prosecuted if he distributed handbills at a certain shopping center, 415 U.S. at 455—adjudicating whether federal law would allow an enforcement action here would require us to determine the legality of state action "in hypothetical situations."[13] *Morales*, 504 U.S. at 382. And of course, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). "A preliminary injunction is not appropriate, however, 'unless the party seeking it can demonstrate that "First Amendment interests are either threatened or in fact being impaired at the time relief is sought."'" *Nat'l Treasury Emp. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (quotation marks and brackets omitted) (quoting *Wagner v. Taylor*, 836 F.2d 566, 577 n.76 (D.C. Cir. 1987) (quoting *Elrod*, 427 U.S. at 373)). Thus, invocation of the First Amendment

---

[12] By citing these cases, we do not suggest that section 230 of the CDA would not apply if Hood were to eventually bring an enforcement action, or cannot be applied at the motion-to-dismiss stage. Indeed, several courts have applied the provision to dismiss claims against Google. *See, e.g.*, *Dowbenko v. Google, Inc.*, 582 F. App'x 801, 804–05 (11th Cir. 2014) (per curiam) (affirming dismissal of defamation claim; rejecting the argument that the CDA did not apply because "Google manipulated its search results to prominently feature the article at issue"); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1122–23 (E.D. Cal. 2010) (rejecting the argument that the CDA did not apply because Google "suggest[ed] keywords to competing advertisers").

[13] Nor is this case like *NiGen*, in which we allowed a suit to proceed where a state attorney general had told the plaintiff that it had "determined" that a specific act—the labeling of products with the letters "HCG"—violated a particular law, and "intimat[ed] that formal enforcement was on the horizon." 804 F.3d at 392–95.

cannot substitute for the presence of an imminent, non-speculative irreparable injury. And we cannot say at this early stage of a state investigation that any suit that could follow would necessarily violate the Constitution. *Cf. Wilson v. Thompson*, 593 F.2d 1375, 1385–88 & nn. 21–22 (5th Cir. 1979) (laying out a fact-intensive test for whether a prosecution constitutes unconstitutional retaliation for an exercise of First Amendment rights).

In sum, as underscored by Hood's apparent need to gather considerable information before he can determine whether an enforcement action is warranted, the prospect of one is not sufficiently imminent or defined to justify an injunction. *See O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) (explaining that enjoining a state's criminal processes is inappropriate absent "a showing of irreparable injury which is 'both great and immediate'"); *Boyle v. Landry*, 401 U.S. 77, 81 (1971) ("[T]he normal course of state criminal prosecutions cannot be disrupted or blocked on the basis of charges which in the last analysis amount to nothing more than speculation about the future.").

## IV.

We conclude that the district court erred in granting injunctive relief because neither the issuance of the non-self-executing administrative subpoena nor the possibility of some future enforcement action created an imminent threat of irreparable injury ripe for adjudication. We express no opinion on the reasonableness of the subpoena or on whether the conduct discussed in the parties' briefs could be held actionable consistent with federal law. The district court's preliminary injunction is VACATED, and this case is REMANDED with instructions to dismiss Google's claims challenging the

No. 15-60205

administrative subpoena and its claims seeking injunctive relief against future enforcement actions.[14]

---

[14] We express no opinion on Google's claims for declaratory relief regarding future enforcement actions, discussion of which is not necessary to decide this interlocutory appeal under 28 U.S.C. § 1292(a)(1).